NOT FOR PUBLICATION

<u>UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY</u>

| | |
|---|---|
| KATHLEEN HUG,<br><br>        Plaintiff,<br><br>     v.<br><br>THE UNION CENTRAL LIFE INSURANCE COMPANY,<br><br>        Defendant. | CIVIL ACTION NO. 98-5047 (DRD)<br><br><u>**OPINION**</u> |

<u>Appearances</u>

McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
Louis P. DiGiaimo, Esq.
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, NJ 07962-2075
*Attorneys for Defendant Union Central Life Insurance Company*

FERRARA, TURITZ, HARRAKA & GOLDBERG, P.C.
Dennis G. Harraka, Esq.
505 Main Street
Hackensack, NJ 07601
*Attorneys for Plaintiff*

<u>***OPINION***</u>

**DEBEVOISE, Senior District Judge**

The parties in this case are Plaintiff Kathleen Hug ("Plaintiff" or "Hug") and Defendant The Union Central Life Insurance Company ("UC"). Plaintiff alleges that UC improperly terminated her disability benefits under an employee welfare benefit plan ("the Plan") as defined by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §

1001, *et seq*.  Plaintiff seeks judgment against UC for actual and punitive damages, interest, costs of suit, and attorney's fees.  Presently before the Court is UC's motion for summary judgment dismissing the Complaint and Plaintiff's cross-motion for summary judgment entered in her favor.  Plaintiff claims she suffers from Post Traumatic Stress Syndrome caused by work-related stress and is unable to work.  She argues that the Court should conduct a *de novo* review of UC's decision and rule that UC violated ERISA by improperly terminating her disability benefits.  UC argues that the Court should apply the "arbitrary and capricious" standard in reviewing the decision to terminate Plaintiff's benefits, and that the termination of benefits was justified based on the medical reports it received.  For the reasons stated below, UC's motion will be granted and Plaintiff's motion will be denied.

## *FACTS / PROCEDURAL HISTORY*

On April 1, 1995 Plaintiff entered into a contract with UC, thereby participating in the employee welfare benefit plan offered through her employer JDR Recovery, Inc. ("JDR").  The Plan entitled Plaintiff to be paid a sum of $2550.00 per month if she suffered a total disability, which prevented her from working.  The contract signed by Plaintiff defined total disability:

> We will consider you totally disabled if a sickness or injury, in and of itself, prevents you from performing the material and substantial duties of your occupation.
>
> Until:
>     1. Age 55; or
>     2. Monthly income has been paid for 120 months, if later;
>
> "Occupation" means your occupation at the time your disability began.  After the period represented by 1 or 2 above, "occupation" means any occupation for which you are or become reasonably suited by education, training, or

> experience, with due regard to prior income earnings.
>
> In order for us to consider you totally disabled, you must be under the regular care and treatment of a physician appropriate for the condition causing disability.  If continued medical treatment will not improve your condition, we will waive this requirement.

Under the "How to File a Claim" section, the contract explained the "Time of Payment of Claims:"

> After we receive your written proof of loss **and if your claim is approved**, we will pay disability benefits due on a monthly basis.  Benefits for any other loss will be paid as soon as we receive proper written proof of loss.

(emphasis added)

Plaintiff worked as a "front line collection agent" for JDR from approximately September 1992 until September 22, 1995.  Plaintiff stopped working because she suffered from post traumatic stress disorder ("PTSD") allegedly caused by "harassment and victimization" she received at her workplace.  The underlying acts that Plaintiff alleges caused her condition consisted of lewd and offensive acts and language engaged in by a male co-worker, JDR's failure to address those acts, and negative treatment Plaintiff received from co-workers after filing a complaint against JDR in the State Court.

On November 22, 1995 Plaintiff filed a claim for benefits under the Plan.  In the statement of claim submitted to UC, Plaintiff reported that her physician expected her to be able to return to work within 6-9 months.  Plaintiff identified Dr. Jerome D. Goodman, M..D. as her attending physician as of October 1995 and Dr. Goodman submitted a statement corroborating Plaintiff's claim.  Plaintiff also identified Drs. Tarle, Waldblum, and Barletti as physicians who had treated her condition from May 1995 till October 1995.  Plaintiff's claim was received by

3

UC on November 28, 1995.  Upon receipt of Plaintiff's submissions, UC initiated an investigation into the claim.  UC sent a Psychiatric Provider Questionnaire to Dr. Goodman, which he completed and returned to UC on December 20, 1995.  Dr. Goodman reaffirmed Plaintiff's diagnosis of PTSD caused by stress in the workplace.  UC additionally retained the services of Northern Intelligence Agency ("NIA") to assist them in conducting the investigation into Plaintiff's claim.  NIA investigators interviewed Dr. Waldblum, who agreed with Dr. Goodman's diagnosis, and Dr. Tarle who opined that Plaintiff 's depression was acute, but not of a long term nature.

In a letter dated April 3, 1996, UC approved Plaintiff's claim and paid her benefits retroactive to November 23, 1995.  UC indicated that its payment to Plaintiff was:

> subject to a full reservation of rights pursuant to the terms of the policy and our ongoing investigation.  We are currently in the process of reviewing information in our file and obtaining additional information which could affect your eligibility for future benefits under your policy and we reserve the right to terminate the claims and request a refund of benefits should the additional information indicate that you are not contractually entitled to benefits under your policy.

During the following months, UC continued to investigate Plaintiff's claim.  Dr. Goodman submitted continuing reports stating that Plaintiff's condition had not changed and that she was still unable to return to work.  As the investigation continued, NIA investigators obtained additional medical records, conducted surveillance of Plaintiff, and interviewed several JDR employees who were acquainted with Plaintiff and suspected she had submitted a false claim. While this occurred, Plaintiff's benefits were continuously re-approved by UC via numerous letters and disbursements of payments.

On July 9, 1998 UC sent a letter advising Plaintiff that:

An endorsement to your disability income policy provides the following:

"Benefits for mental or nervous disorders are provided to a lifetime maximum of 24 months."

As a result, we should have only paid benefits for a period of 24 months, that is through November 22, 1997.  Because this was overpaid in error, we will waive collection of seven months of additional benefits which should not have been paid.  However, no further benefits are payable under this policy for disabilities from mental or nervous disorders.

On July 14, 1998, Plaintiff telephoned UC disputing the applicability of the 24 month limitation. Plaintiff stated that the policy did not contain a 24 month limitation on mental or nervous disorders and promised to file suit against NIA and UC if her benefits were not reinstated.  On September 30, 1998 Plaintiff filed a complaint against NIA and UC in the Superior Court of New Jersey alleging that Defendants improperly terminated her benefits.  On November 6, 1998, the case was removed to the Federal Court.

On July 16, 1999 Plaintiff and Defendants entered into a stipulation whereby the case would be administratively stayed while the matter was remanded to UC to render a determination regarding Plaintiff's eligibility for benefits due to total disability.  Plaintiff agreed to dismiss NIA from the suit, and both remaining parties agreed that the endorsement containing the 24 month limitation on benefits for mental and nervous disorders would be deleted.  During the administrative stay, UC obtained updated records from Dr. Goodman, who continued to treat Plaintiff and stated that her condition remained unchanged due to her lack of funds for more frequent treatment.  In his report of July 10, 1999, Dr. Goodman reported:

... It should be stated at the outset that Mrs. Hug has not had sufficient funds to attend medical psychotherapy on a regular basis.  In fact, she has been seen

5

> only 16 times in the last 13 months. If I had preference and control over this matter, she would be seen weekly. Suffice to say - and this is particularly directed toward Union Central Life - that the reason that Kathleen Hug has made minimal progress, and even has suffered some deterioration, is the fact that she cannot afford her regular therapy. I have been carrying her for the last six months without a single payment!
> ...

UC also retained Dr. Paul Nassar, M.D., an independent physician, to examine Plaintiff.

Dr. Nasser performed a psychiatric evaluation of Plaintiff on August 23, 1999. Dr. Nassar referred Plaintiff to Dr. Ann Winton, Ph.D., for an additional evaluation, which took place on September 15, 22, and 30, 1999. Dr. Winton administered the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) to Plaintiff as part of her exam. On December 2, 1999, Dr. Winton reported her findings to Dr. Nassar. Dr. Winton's report explained:

> There is a serious question whether [Plaintiff] made an excessive effort to deliberatively distort the test results in a self-favorable direction.
> ...
> Ms. Hug's responses to items on the various validity scales indicate that she made unrealistic claims of virtue. ... There was a conscious attempt to deny negative characteristics that most people easily endorse. Therefore, while her profile was within the acceptable limits on the validity scales, this must be interpreted with caution.
> ...
> <u>Conclusion</u>: the MMPI-2 profile indicated that Ms. Hug is not coping very well with the demands of her life. She is a passive, dependent person who is severely depressed. She was naive, and moralistic. She was guarded in interview and too guarded to cooperate with the MMPI-2 self-appraisal. There was a <u>conscious attempt</u> to deny negative characteristics most people easily endorse. She had no insight into her own behavior and ma[d]e many moral judgments about those around her. It is impossible to assess what is the result of the alleged behaviors of colleagues at work and what were pre-existing personality problems. There is no independent information about her personality and coping skills earlier in her life.
> ...
> Both the interview with Ms. Hug and the MMPI-2 results demonstrate conscious attempts to influence the outcome. This test-taking style seriously weakened the validity of the MMPI-2. It indicated either an unwillingness

>or inability to disclose personal information. She was rigid in approach and was unable to admit[] to small difficulties, easily endorsed by others. Her profile and responses suggest disappointment in her interpersonal life, both personal and at work. With others, she would "follow the rules" in a literal and unbending way such that others in her life might find her difficult to deal with in interpersonal situations.

After reviewing Dr. Winton's report, Dr. Nassar issued a summary of his findings on January 10, 2000 , wherein he opined:

>Kathleen Hug presented with complaints of depression. However, her presentation is motivated by secondary gain, both financial and psychological. She is not motivated to work, as her husband is retired and they wish to live in Florida. She is not disabled, but chooses not to work. The prognosis is guarded, because she has no wish to work. Perhaps, with aggressive and confrontational-styled therapy, she can be motivated to resume her usual functioning. However, given that her husband is over twenty years older, and is retired, I doubt that she would be amenable to such an approach.

In issuing his opinion, Dr. Nasser noted that Plaintiff has been through two divorces, and has experienced separation from her children, both of which would appear to cause more stress than the problems she encountered at JDR. However, Plaintiff never ceased working after those occurrences.

Dr. Nasser's and Dr. Winton's reports were forwarded to Dr. Goodman, and he submitted a response to them on April 10, 2000. Dr. Goodman objected to the findings in these reports, and reaffirmed "that Mrs. Hug is clinically unable at this time to return to the work place and is truly disabled via her stress response, her somatic manifestations, and her clinical depression." He noted inconsistencies in the other reports, and questioned the length of the exams as well as their validity. In Dr. Goodman's response he questioned the objectivity of Dr. Nasser, hypothesizing that "as a hired, non-treating, finder of possible loopholes in insurance disclaimers, he was hard

pressed to deny Mrs. Hug's demonstrable pathology."

On July 21, 2000, Dr. Winton reaffirmed her findings after reviewing Dr. Goodman's response. On August 1, 2000, Dr. Nasser responded as well, stating that "as the treating therapist of Ms. Hug, he clearly presents himself as an advocate supporting her cause and claim for disability. As a therapist, this suggests an over-emotional involvement with the loss of clinical objectivity." Dr. Nasser explained the reasoning for his report :

> ... Dr. Goodman suggests that my findings of psychological issues in her antecedent history should have been construed as making her more disabled. However, he failed to realize that her history of experiencing stressful events and her ability to adjust to important changes in her life (such as the loss of custody of her children), reflected Ms. Hug's resiliency to stressors. He also failed to realize that this is demonstrated in the fact that during the year in which she was undergoing great psychiatric injury, she was the most productive she had been at this company. Complaints of psychiatric injury that do not correlate with functional incapacity are contradictory and inconsistent with claims of Post Traumatic Stress Disorder.
>
> ...Dr. Goodman is correct in saying that I did not suggest that seeing Ms. Hug on such an infrequent basis, in an attempt to treat her major depression, is significant. Also the pharmacological treatment had been poorly monitored, (for example, blood levels were never taken), which would help establish whether or not clinically effective levels of the medication were being given, or whether Ms. Hug was even complying with taking the medications. Dr. Goodman never explained why overhearing sexual material [the alleged cause of Plaintiff's disability] produced the overwhelming incapacitating effects of Post Traumatic Stress Disorder. I suspect it had not been explained because there is no clinical explanation that is consistent with such a precipitant causing this problem. Also, if Mrs. Hug has been treated for five years for major depression, (a very treatable illness), Dr. Goodman himself should be questioning the efficacy of his treatment and possible alternative treatments, such as inpatient care, electric shock therapy, consultation with a psychopharmacologist, etc. Also, he never commented on Ms. Hug's lack of motivation to return to the workforce, although she clearly revealed to this examiner that her husband wished to retire to Florida.

On August 31, 2000, UC sent a letter informing Plaintiff's attorney that it would not

renew Plaintiff's disability benefits:

> Based upon the medical records in our file, Ms. Hug's psychiatric complaints are inconsistent with her demonstrated ability to function over a significant period of time during very difficult situations, and are also inconsistent with the psychological testing performed. In addition, Ms. Hug's policy requires that she be under the regular care and treatment of a physician; Dr. Goodman's records indicate that his treatment of her has been insufficient and in his opinion she would benefit from additional treatment. Accordingly, no benefits are due her at this time.
>
> Since civil action has been stayed pending our final determination on Ms. Hug's claim for disability benefits, you may consider [] this our final decision. ...

On September 20, 2000, the Court entered an order removing the administrative stay and restoring the case to the active calendar. A scheduling order entered on November 20, 2000 required that all discovery be completed by March 15, 2001. However, in the interim, Plaintiff experienced a fire in her home in which a great deal of the documents pertaining to this case were destroyed. On April 4, 2001, the Court administratively dismissed the case so Plaintiff would have time to re-obtain copies of those documents and manage the problems stemming from the fire. On December 8, 2004, Plaintiff moved to reopen the case, and on March 7, 2005, the case was restored to the active calendar.

UC now moves for summary judgment dismissing the Complaint. Plaintiff has cross-moved for summary judgment in her favor. UC argues that the Court should review the termination of Plaintiff's benefits under the arbitrary and capricious standard, while Plaintiff argues that the Court should conduct a *de novo* review.

## DISCUSSION

Summary Judgment is appropriate when the record "show[s] that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  Id.  In deciding whether there is a disputed issue of material fact, the Court must view the evidence in favor of the nonmoving party by extending any reasonable favorable inference to that party; in other words, "[T]he nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in [that party's] favor."  Hunt v. Cromartie, 526 U.S. 541, 552 (1999), quoting, Anderson, 477 U.S. at 255.  But where the nonmoving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing' - that is, pointing out to the District court - that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (U.S. 1986).

In the present case, UC argues for summary judgment dismissing the Complaint, and Plaintiff argues for summary judgment entered in her favor.  In order to determine whether to grant summary judgment for either side, the Court must first decide the applicable standard with which to review UC's decision to terminate Plaintiff's benefits.  Then the Court can decide whether UC's decision was appropriate under the law.

**A.     Standard of Review**

Section 1132 of ERISA allows a participant or beneficiary to bring suit to recover

benefits under a plan that falls under the Act.  The standard courts apply when reviewing claims for benefits depends on whether the benefit plan vests discretion with the administrator or fiduciary.  The Supreme Court explained in Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989), "a denial of benefits challenged under [section] 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  If the administrator or fiduciary has been vested with discretionary authority, the arbitrary and capricious standard of review is to be applied.  Id.  The Court of Appeals for the Third Circuit has determined that the discretion required to trigger the arbitrary and capricious standard of review can be express or implied from the plan's terms. See Luby v. Teamsters Health, Welfare, and Pension Trust Funds, 944 F.2d 1176, 1180 (3d Cir.1991).  However, where the terms of the Plan are ambiguous in this regard, the Court should apply the principle of *contra proferentum*, which is derived from the following recognition:

> [i]nsurance policies are almost always drafted by specialists employed by the insurer. In light of the drafters' expertise and experience, the insurer should be expected to set forth any limitations on its liability clearly enough for a common layperson to understand; if it fails to do this, it should not be allowed to take advantage of the very ambiguities that it could have prevented with greater diligence. Moreover, once the policy language has been drafted, it is not usually subject to amendment by the insured, even if he sees an ambiguity; an insurer's practice of forcing the insured to guess and hope regarding the scope of coverage requires that any doubts be resolved in favor of the party who has been placed in such a predicament.

Heasley v. Belden & Blake Corp., 2 F.3d 1249, 1257 (3rd Cir. 1993).

In <u>Luby</u> the Court ruled a general grant of administrative power to the plan trustees did not imply authority to decide specific disputes between beneficiary claimants. <u>Id.</u> at 1181. The Court also determined an express grant of discretion in one specific area of a plan undermined a claim that the administrator possessed implied discretion in another area of the plan. An express grant in one area, the Court reasoned, demonstrated that had the drafters intended to grant discretion in another area, "they knew how to say so and would have expressly done so." <u>Id.</u> Likewise, in <u>McLain v. Metropolitan Life Ins. Co.</u>, 820 F.Supp. 169, 174-75 (D.N.J. 1993), the Court held that where the plan provides that the administrator "has exclusive right to interpret the provisions of the Progam/Plan," and the terms of the plan required a claimant to submit "satisfactory proof" that a decedent suffered bodily injuries, discretionary authority exists and the arbitrary and capricious standard of review should be applied.

Courts have applied the arbitrary and capricious standard where a fiduciary has discretionary authority in making eligibility determinations, even where the word "discretion" was not used in the plan. See <u>Nazay v. Miller</u>, 949 F.2d 1323, 1335 (3d Cir.1991) (discretion found based on authority to "interpret and construe provisions ... determine eligibility ... make and enforce rules ... decide questions...."); <u>Stoetzner v. U.S. Steel Corp.</u>, 897 F.2d 115, 119 (3d Cir.1990) (discretion found based on authority to "administer, ... decide all questions," interpret and apply rules). Courts have additionally found discretionary authority conferred on an administrator who is required to determine "whether an applicant is 'disabled,' using medical evidence *satisfactory* to the [insurance] company." <u>Miller v. Metropolitan Life Ins. Co.</u>, 925 F.2d 979, 983 (6th Cir.1991) (emphasis supplied); <u>see also</u> <u>Bali v. Blue Cross and Blue Shield Ass'n,</u>

873 F.2d 1043, 1047 (7th Cir.1989) (same). Discretion has also been found to be conferred when the plan permits the administrator to decide "what sort of evidence may be required from the applicant to provide a basis for the subsequent ... determination." Miller 925 F.2d at 984; Bali, 873 F.2d at 1047.  However, where a plan is vague or ambiguous in this regard, ERISA requires that the Court err on the side of the insured and conduct a review *de novo*.  Heasley, 2 F.3d at 1257.

In the present case, UC argues that the following statement in the Plan impliedly confers discretionary authority on UC to make the decision:

> After we receive your written proof of loss **and if your claim is approved**, we will pay disability benefits due on a monthly basis. Benefits for any other loss will be paid as soon as we receive proper written proof of loss.

(emphasis added).  However, this provision is merely a passive reference contained in the section of the Plan that describes how to file a claim.  More specifically, this provision is in a subsection entitled: "Time of Payment of Claims," which states nothing at all about what facts the administrator will take into consideration when deciding "if your claim is approved."  In determining what standard to apply when reviewing UC's decision, the Court must ask whether the lay person reading and signing the policy in question would understand that she is agreeing to submit herself to the administrator's decisions.  The passive reference to an approval process cited above neither expressly nor impliedly places the beneficiary on notice.  The Plan is vague and ambiguous in regards to the approval process, and in accordance with the Court's opinion in Heasley this must be interpreted in favor of the insured.  The Court will therefore apply a *de novo* standard of review.

**B.** **UC's Decision**

A District Court exercising *de novo* review over an ERISA determination is permitted to consider evidence that was not before the fund's administrator. Luby 944 F.2d at 1185. However, a District Court is not **required** to conduct a *de novo* evidentiary hearing or full trial *de novo* if the record on review is sufficiently developed. Id. If the record is sufficiently developed, a District Court may, in its discretion, merely conduct a *de novo* review of the record of the administrator's decision, making its own independent determination. Id. (citing McMahan v. New England Mut. Life Ins. Co., 888 F.2d 426, 431 (6th Cir. 1989). In the present case, the record considered by UC contains all the information necessary to perform this review. The record includes copies of: (1) all relevant communications between UC and its representatives; (2) all investigatory actions taken by NIA investigators; (3) statements obtained from all witnesses interviewed by UC and NIA; (4) statements from Plaintiff; and (5) medical reports and records from all physicians and/or psychologists who have examined Plaintiff in order to assess or treat the affliction forming is the basis of her claim. Therefore, the Court will merely conduct a *de novo* review of the record of the administrator's decision.[1]

---

[1] UC's decision to terminate Plaintiff's claim was finalized on August 31, 2000. However, Plaintiff argues that the Court should consider the following evidence generated after this date: (1) a diagnosis of dialated idiopathic congestive cardiomyopathy from her cardiologist dated April 17, 2003, (2) a letter from the Social Security Administration entitling her to disability benefits in June 2003 and (3) additional reports of diagnosis from Dr. Goodman extending to May 12, 2005. Considering evidence of ailments (or aggravation of preexisting ailments) that Plaintiff contracted after UC made its decision would be beyond the scope of this review. While these afflictions could provide basis for a new claim under Plaintiff's policy, UC has not been given the opportunity to either grant or deny those claims. Such subject matter is not ripe for the Court's consideration. The Court will also decline to consider Dr. Goodman's

ERISA provides "a panoply of remedial devices" for participants and beneficiaries of benefit plans. Firestone Tire, 489 U.S. at 108. Section 1132(a)(1)(B) allows a suit to recover benefits due under a Plan, to enforce rights under the terms of the plan, and to obtain a declaratory judgment of future entitlement to benefits under the provisions of the plan contract. Id. Plaintiff alleges in her Amended Complaint that she "fully and properly performed all requirements of said Policy to be performed by her and [UC] breached [its] contractual obligations... by failure to continue making said monthly payments." Am. Compl. ¶ 13. Plaintiff argues that UC improperly applied the following provision of her Plan:

> We will consider you totally disabled if a sickness or injury, in and of itself, prevents you from performing the material and substantial duties of your occupation.
>
> Until:
>     1. Age 55; or
>     2. Monthly income has been paid for 120 months, if later;
>
> "Occupation" means your occupation at the time your disability began. After the period represented by 1 or 2 above, "occupation" means any occupation for which you are or become reasonably suited by education, training, or experience, with due regard to prior income earnings.
>
> In order for us to consider you totally disabled, you must be under the regular care and treatment of a physician appropriate for the condition causing disability. If continued medical treatment will not improve your condition, we will waive this requirement.

Plaintiff argues that she was deemed to be disabled when she initially filed her claim, and her

---

letter of November 10, 1999 as it simply reiterates previous assertions in documents already contained in the record.

15

condition did not substantially change when UC made its final decision on August 31, 2000. On that date, UC's letter to Plaintiff's attorney provided its rationale for not renewing Plaintiff's disability benefits:

> Based upon the medical records in our file, Ms. Hug's psychiatric complaints are inconsistent with her demonstrated ability to function over a significant period of time during very difficult situations, and are also inconsistent with the psychological testing performed. In addition, Ms. Hug's policy requires that she be under the regular care and treatment of a physician; Dr. Goodman's records indicate that his treatment of her has been insufficient and in his opinion she would benefit from additional treatment. Accordingly, no benefits are due her at this time.
>
> Since civil action has been stayed pending our final determination on Ms. Hug's claim for disability benefits, you may consider [] this our final decision. ...

The Court must review the plan administrator's decision to terminate Plaintiff's benefits in order to determine whether it is the legally correct interpretation of relevant plan provisions. In the present case, UC's decision was clearly justified.

UC's understanding of Plaintiff's condition was expanded greatly from September 22, 1995 (the date Plaintiff's claim was originally approved) through August 31, 2000 (the date UC made its final decision refusing to renew Plaintiff's benefits). At the outset, UC based its determination on Dr. Goodman's diagnosis and not much else. UC informed Plaintiff at the outset that her claim was subject to the ongoing investigation and that her benefits could be terminated if evidence "indicate[d] that [Plaintiff] was not contractually entitled to benefits under [the] policy." However, as the investigation developed, UC compiled a significant amount of evidence, which brought the validity of Plaintiff's claim into question. This included the initial reports of Plaintiff's treating physicians estimating a 6-9 month disability period, and the

16

expiration of that period. It also included statements of Plaintiff's co-workers (obtained by the NIA investigators) as well as the independent medical opinions of Dr. Nasser and Dr. Winton, which concluded that Plaintiff was not totally disabled. All of this evidence brought into question the validity of Plaintiff's claim.

Although Dr. Goodman's diagnosis has remained essentially unchanged, UC had no obligation to give deference to his opinion over that of the independent physicians. UC shared all the independent reports with Dr. Goodman and provided him with the opportunity to retort and introduce new evidence of Plaintiff's disability, but any additional comments were unpersuasive. Additionally, both Dr. Goodman and Dr. Nasser agreed that Plaintiff's condition was entirely controllable with more frequent treatment. The Policy clearly states that in or to be considered totally disabled, Plaintiff "must be under the regular care and treatment of a physician appropriate for the condition causing disability." Plaintiff was therefore obligated to seek out and obtain an appropriate frequency of treatment in order to continue receiving her benefits, and she did not. Where the original diagnosis forecasted a disability of 6-9 months, and the disability at that point had lasted over 5 years, the lack of adequate treatment is extremely relevant.

Based upon review of the record, the Court agrees with UC's decision to terminate Plaintiff's disability benefits. UC made its determination based on its rational interpretation of the record and the Court, in reviewing the evidence *de novo* finds no reason to reverse this decision.

### *CONCLUSION*

For the reasons stated above, the Court will grant UC's motion for summary judgment dismissing the Complaint. The Court will deny Plaintiff's cross motion for summary judgment.

                                                  /s/  Dickinson R. Debevoise
                                                  Dickinson R. Debevoise, U.S.S.D.J.

April 10, 2006